Mel M. Marin            8/20/2013
Box 1654
Hermitage, PA  16148

Plaintiff
*Pro Se*



IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

**CIV13-1093 TUC JGZ**

| | |
|---|---|
| MEL M. MARIN, | Civil Number _____ |
| Plaintiff, | COMPLAINT |
| v. | FOR NEGLIGENCE AND |
| ERIC SPARKS, | FOR FRAUD AND |
| Defendant. | FOR WRONGFUL DEATH |
| | JURY DEMANDED |

Plaintiff alleges as follows:

## JURISDICTION AND VENUE

1. This court has jurisdiction under 28 U.S.C. §1332 because defendant is domiciled in Arizona and plaintiff is domiciled in Pennsylvania, and the claim exceeds $1 million.

1

# FIRST CAUSE OF ACTION
# FOR MALPRACTICE ( NEGLIGENCE )

2. The elements a plaintiff must allege and prove for an attorney malpractice claim are (a) existence of a duty, (b) breach of that duty, (c) negligence by the attorney that was an actual and proximate cause of injury, and (d) the extent of the injury, under Phillips v. Clancy, 152 Ariz. 415, 418, 733 P.2d 300, 303 (Ct. App. 1986).

3. On about September 18, 2001, plaintiff made an appearance by phone for a hearing in the bankruptcy action In re Marinkovic, 01-3665-JMM in Tucson, Arizona, for a motion made by plaintiff in that court to try to protect Tucson property owned by plaintiff Marin, and listed on the bankruptcy papers as property owned by plaintiff's father, Milivoj Marinkovic.

4. In that hearing the bankruptcy judge directed plaintiff to go do several things: (a) hire a lawyer to appear in Arizona, and (b) have that lawyer apply to convert the case from Chapter 13 to Chapter 11; and (c) have that lawyer file a timely bankruptcy plan so as to avoid dismissal and loss of the Tucson apartments that the bankruptcy protects; and (d) then have that lawyer resubmit son's motion for the use of cash collateral.

5. On about September 20, 2001, at around noon N.Y. time, and on September 24th, 2001 at exactly 4:20pm N.Y. time plaintiff called from Washington, D.C. and spoke with defendant Attorney Eric SPARKS, and told defendant SPARKS about the judge's instruction, and sought to hire defendant to represent plaintiff's father in that proceeding generally, and the family trust at the same time.

6. The hiring for father was conditioned on Lawyer SPARKS making a separate agreement with plaintiff-son to do two of the things listed above immediately, in order to prevent foreclosure of the Tucson apartments: filing a plan by a coming deadline and converting the action to Chapter 11.

7. Plaintiff also notified Attorney SPARKS that father does not understand English well, and does not know the meaning of words and will not admit it; and son must explain words and for that reason father is son's dependent ; so son has to do many transactions for father just to function daily; or an attorney must be in court to explain simple words to father/debtor.

8. With this understanding Attorney SPARKS agreed and to file necessary conversion papers by the coming deadline and to file a timely bankruptcy plan.

9. On those bases father signed the retainer and left it at the office of Attorney SPARKS, and plaintiff-son on September 24th, 2001 sent the retainer agreement to the FAX number Attorney SPARKS had given September 20th: 520-623-9157.

10. Attorney SPARKS thereby had a contract with plaintiff-son to do those things listed above, and particularly the filing of a timely plan and conversion to Chapter 11, for father. SPARKS also had a contract with plaintiff's father, the third-party beneficiary of the agreement between son and SPARKS to protect father's rights. And SPARKS had a contract with the family trust as another third-party beneficiary under the rule in Paradigm Ins. Co. v. Langerman Law Offices, 200 Ariz. 146, 153 ¶¶ 23-24, 24 P.3d 593, 600 (2001) and Petrine v. Sinchak-Higby, 2009 Ariz. App. Unpub. LEXIS 970 at ¶ 13 (June 2, 2009).

11. SPARKS knew or should have known that father's trust and father's beneficial interest in $400,000 property in that trust were also intended beneficiaries of SPARKS' hiring, since Attorney SPARKS admitted to the bankruptcy judge on the record that son was the owner of the subject property as trustee and that father had a beneficial interest with a right of revocation under the trust, and Attorney SPARKS knew or should have known that the failure of SPARKS to protect the Tucson property would result in the complete destruction of father's rights and the trust rights in the same property since father's and the trust's rights were derivative of son's, under the rule in Paradigm Ins. Co. v. Langerman Law Offices, 200 Ariz.

3

146, 152 [9] ¶23, 24 P.3d 593 (2001) (lawyer owes a duty to non-client and can be directly liable to non-client for negligence when he knows that one of the client's objectives is to benefit the non-client, that help does not damage the client, and the absence of the help to the non-client also hurts the lawyer's performance of his duties towards his own client); and Wetherill v. Basham, 197 Ariz. 198, 207 [14], ¶36, 3 P.3d 1118 (App. 2000) (lawyer *could* owe duty to both a client and a non-client in a trust situation, if intent to benefit non-client were present); and Capitol Indem Corp. v. Fleming, 203 Ariz. 589, 58 P.3d 965, 967 [3] ¶¶ 6, 7 (2002)(when a lawyer undertakes to represent the guardian, he also undertakes representation of the ward, where benefit to one is intended by the other).

12. Because of this, SPARKS owed an ordinary duty of care and a heightened or special duty of care in the nature of a fiduciary duty to father, son and trust.

13. But SPARKS breached that duty.

14. Specifically, Attorney SPARKS negligently failed to file the required bankruptcy plan by the deadline set by the bankruptcy judge, and at a hearing on October 22, 2001, the judge noted on the record that Attorney SPARKS failed to file the bankruptcy plan on time as required, and solely on that basis the judge dismissed the bankruptcy and in the same hearing invited the foreclosing bank to go ahead and sell the property because of the negligence of Attorney SPARKS.

15. The bank did so, thereby destroying immediately $400,000 - $700,000 of father's and son's and the family trust's property.

16. Further, Attorney SPARKS deliberately lied to both father and son before the October 22, 2001 hearing to hide his negligence, telling them (a) that the attorney for the foreclosing bank had or would agree to extend the time to file the plan which fact was false and (b) that the bankruptcy judge had approved an extension of time to file the late plan, which was also false because the judge denied both of those facts at the hearing on October 22, 2001.

17. In boldly misrepresenting to father and son before the hearing, SPARKS thereby breached his fiduciary duty of honesty to his clients, and prevented them from taking mitigating steps like firing SPARKS and hiring a different lawyer, which they could have attempted the day before the hearing had they known the truth.

18. Father and son were unaware of the true facts and were unable to avoid the surprise dismissal on October 22, 2001; and father and son did all they reasonably could have done to help Attorney SPARKS.

19. But for the negligent failure of SPARKS to file the plan on time, father and son would have filed a successful bankruptcy plan that would allow them to preserve the apartments, and prove that they were never in default on any payments, and generate income from the apartments to pay the litigation costs and the medical costs father required and the mortgage compelled.

20. Son then attempted to mitigate potential losses by doing what Attorney SPARKS told son to do following the dismissal hearing: re-file a second bankruptcy in New York under the name of the family trust in order to avoid another filing under Chapter 11 in front of Arizona Bankruptcy Judge Marlar who Attorney SPARKS characterized as biased against father and son for no apparent reason.

21. However, the New York bankruptcy judge dismissed the case because a family trust cannot be a debtor in a bankruptcy court, and Attorney SPARKS had failed to inform father or son that a family trust is not allowed in a bankruptcy court; and on the day of the dismissal order January 25th, 2002, the foreclosing bank then executed the sale that the Arizona judge told them to do, and sold the $400,000 Arizona apartments to themselves. .

22. Defendant SPARKS therefore, had a duty of care toward father, son and trust, and breached that duty.

23. Father and son and trust were damaged, therefore, as owners of the same property by actual damages of $ 419,000 which was the value of the property in 2001, and by the loss of trustee's fees for son's work on the family trusts in the

amount of $300,000, and by the value of the loss to father and his trust for work that had to abandon for the years 2001 to 2009, due to the fact that plaintiff-son had to spend all of his time outside of active military duty in bankruptcy courts, trying to recoup the family losses and return the property by desperate legal actions, and by the inability of father and son to pay for medical treatments for father's health.

24.  Father then made yet a 3rd attempt to save the apartments by filing a 3rd bankruptcy, in Arizona in January 2002 after the apartments were taken by the bank, to try to prove the sale was improper because the buyer was not a Bona Fide Buyer, and to gain time to prevent eviction of father from the apartments. But the state courts refused to proceed after the bankruptcy court giveaway, and the bankruptcy judge refused to go further because father's new lawyer in the 3rd bankruptcy who is a colleague of SPARKS, failed entirely to object to a motion of the bank for judgment in its favor.

25.  Defendant was negligent by (1) failing to file a bankruptcy plan by the deadline required by the court, which was an actual and proximate cause of the loss of the Arizona apartments valued at the time at $419,000. and (2) giving father and son bad advice about filing in New York, which sabotaged their efforts to reverse the damage caused by SPARKS.

26.  That negligence ended the apartments and son's trustee's lien, despite father and son's efforts to rescue the loss with a 3rd bankruptcy, and caused the loss of family property in California, Pennsylvania, and New York because father and son could not pay the mortgage costs, taxes, or upkeep, and ended ongoing real estate projects, valued at $2.8 million.

27  Father and son then filed an action similar to the present one in 2003 while the 3rd bankruptcy was pending, but it was dismissed for lack of jurisdiction because the bankruptcy judge had not expressly allowed the new state action, and father was directed that he had no right and may not proceed until after the bankruptcy court approves this action or dismisses the bankruptcy, in Marinkovic v.

Sparks, C2002-5182 (Super Ct. Pima May 30, 2003).

28. Son also tried to file an independent action of his own in the 2nd federal Circuit before the end of the Arizona bankruptcy against a New York foreclosure action, but that was also stopped until the bankruptcy is closed, by Marin v. Utica, 140 F. App'x 304 (2nd Cir. 2005).

29. Thus, because this and all actions were prevented by state and federal court orders until the end of the Arizona bankruptcy, all limitations periods were stopped for nine nears and all claims survive under the rule in Piatt v. McDougall, 773 F.2d 1032, 1035 [5] (9th Cir. Ariz. 1985)(court declining to take jurisdiction is not *res judicata* even if it had the ability to do so).

30. The bankruptcy was dismissed in spring of 2009, and the dismissal was appealed to the 9th Circuit Court of Appeals until denial in about October 2009. Those courts' orders that prevented this action tolled the start of the running of the statute of limitations for legal malpractice to October 2009, plus another 90 days to allow a U.S. Supreme Court petition, or January 2010.

31. Father had also died in November 2008, leaving his son, plaintiff, to prosecute all claims on behalf of his father because father's trust made his son, this plaintiff, the assignee of father's claims and sole beneficiary.

32. Therefore, son is entitled to proceed with father's claims and with the trust's claims, as the full and outright owner of new causes of action starting in January 2010 and not as a representative of anyone.

33. The statute of limitations for attorney negligence is two years, under Arizona Revised Statutes § 12-542, and three years for breach of fiduciary duty based on fraud under A.R.S. § 12-543 (3).

34. These claims did not start to accrue, therefore, until the end of the bankruptcy appeal and the passage of 90 days for Supreme Court review in January 2010.

35. Additionally, because the 3rd bankruptcy appeal could have reversed the "giving away" of the Arizona apartments by the bankruptcy judge and prevented the entire $700,000 loss of the apartments and son's liens, and the loss of the properties and projects in other states, the claim did not accrue until that appeal dismissal in January 2010 under the rule in Mackenzie v. Leonard, cv-08- 1737, 2010 U.S.Dist. LEXIS 200 at * 11  (D. Ariz. Jan. 4, 2010)(if a prior appeal could have prevented the loss alleged, there is no injury and the limitations  period does not start to run until after that appeal ends without success).

36. That gave son two years from January 2010 to move against SPARKS under negligence and three years under breach of fiduciary duty based on fraud.

37. But son stopped the running of that time by submitting this same complaint in the Superior Court of Pima County, with a request for fee waiver or deferment on October 25, 2010, under the rule in Lacina v. G.K.  Trucking, 877 F.2d 741, 742 (9th Cir. 1989)(limitations period stops on tender of complaint even if not in compliance with local rules), McCrum v. Elkhart County Dept. of Public Welfare, 806 F.Supp. 203 (N.D.Ind. 1992)(request for *pauperis* and submission of complaint stops limitations periods),

38. The court clerk then refused to file the complaint because the clerk required son to fabricate income that did not exist, and put into the boxes that the clerk wanted.  Despite several attempts by son and mail exchanges with court staff and judges over a several year period, the clerk persisted in refusing.

39. Plaintiff-son then appealed that refusals of the clerk to grant fee waiver or deferment and son appealed the refusals under the rule in Friends of the Coast Fork v. US Dept. of the Interior, 110 F.3d 53 (9th Cir. 1997)(granting of only partial fee waiver is immediately appealable as a denial of IFP), Roberts v. United States District Court  for The Northern District of California, 339 U.S. 844, 70 S.Ct. 954, 955 [3](1950) (denial of IFP status is jurisdictional and is an immediately appealable order), and  Zaroff v. Holmes, 379 F.2d 875, 877 (D.C. Cir. 1967)(dismissal for

failure to file initial papers and pay fees is not prejudicial).

40. The Arizona Supreme Court declined a review in July 2013, and that time in that appeal also stopped all limitations periods under the rule in <u>Missouri v. Jenkins</u>, 495 U.S. 33, 45, 110 S.Ct. 1651, 1660, 109 L.Ed.2d 31 (1990), <u>Berroteran-Melendez v. Immigration and Naturalization Service</u>, 955 F.2d 1251, 1254 (9th Cir. 1992)(tolled until last appeal is final), <u>Berg v. Leason</u>, 793 F.Supp. 903 (N.D.Cal. 1992), <u>reversed</u>, 32 F.3d 422, and <u>Attwood v. Mendicino Coast Dist Hosp.</u>, 886 F.2d 241 (9th Cir. 1989) (equitable tolling is available based on a prior state proceeding dismissed without reaching the merits).

41. The deadline within which to file this action, therefore, is still one full year away on the negligence claims and two full years away on the fraud claims, making this action timely. That makes this action well within the limitations periods.

42. WHEREFORE, plaintiff seeks and is entitled to $ 2.8 million from defendant in actual damages and another $15 million in punitive damages.

## SECOND CAUSE OF ACTION
## FOR BREACH OF FIDUCIARY DUTY BY FRAUD

43. Allegations 1- 42 are incorporated herein by this reference.

44. When Attorney SPARKS told father and son in October 2001 that he had arranged for an agreement from the opposing bank and the judge to extend the time for filing a bankruptcy plan past the judge's initial deadline, the lawyer boldly lied.

45. Father and son had no way of knowing what the attorneys and the judge said to each other and could not possibly know that they were being lied-to. On that basis they justifiably relied on the representations of their lawyer SPARKS.

46. At the time SPARKS made the false representations, however, he knew he was lying and the judge in the hearing in October 2001 stated that he never made such an extension and would not agree to one.

47. Father ans son were injured by the false representations of SPARKS because they would have had at least a few days to find other counsel to meet the deadline and fire SPARKS, had SPARKS just told them the truth. They would have scoured the state to find someone at the last minute had SPARKS told the truth. Thus, SPARKS crippled their ability to protect themselves by his bold lies.

48. SPARKS thereby breached a high duty of care toward father son and trusts called a fiduciary duty by committing a fraud.

49. Father and son were injured, therefore, by the fraud in the following ways:

   a. Father lost the entire $400,000 apartments.

   b. Son lost his $300,000 trustee's lien on them.

   c. Father and son and family trust lost the family home in California worth $1 million because of inability to pay the mortgage which the apartments paid for.

   d. Father and son and family trust lost the projects and properties in Pennsylvania and New York worth another $100,000.

   e. Son lost his active duty military career and his civilian career and a normal social life for two decades valued at $1 million, by having to concentrate all of his efforts on the bankruptcies to recover the property and generate the income for father's (and mother's) health care costs.

   f. The family medical research with alternative medicine was forced to stop completely, putting father and mother at health risk immediately.

   g. Father died early as a result of the lack of income to continue that work.

50. WHEREFORE, plaintiff seeks and is entitled to $ 2.8 million from defendant in actual costs, and another $15 million in punitive damages.

## THIRD CAUSE OF ACTION
## FOR WRONGFUL DEATH

51. Allegations 1- 50 are incorporated herein by this reference.

52. In Arizona a death is wrongful when it is caused by any wrongful or negligent act of anyone, not just by a doctor, when it would otherwise not have happened at the time or in the manner it did, according to Arizona Revised Statutes, Section 12-611.

53. The wrongful or negligent act can include simply denial of medication that could have extended the patient's life under the rule in Ashcraft v. King, 228 Cal.App.3d 604, 605, 278 Cal.Rptr. 900 (1991)(withdrawal of medical care that debilitates a patient can constitute battery).

54. SPARKS' negligence and deliberate fraud resulted in the loss of the apartments and, therefore, the loss of income needed by father to continue alternative medical cures.

55. With that alternative care father would have lived longer.

56. Additionally, the negligence of SPARKS in 2001 also caused a continuing stress from litigation, multiple evictions including threats of arrest and death during an eviction, and destruction of the entire family estate in 2002, 2003, 2004, 2005, 2006, 2007 and 2008, that finally drove father to his grave trying to recoup the dream, and the life SPARKS destroyed.

57. Therefore, but for the wrongful acts of SPARKS described above, father could or would have lived longer so the fraud and negligence of SPARKS was an actual or proximate cause of the father's death.

57. Under the law, it is not necessary for one cause to be the only reason for injury, to find "actual and proximate or legal cause of the injury or death".

58. Instead, it is possible for several causes to contribute to an injury or death, including old age, and the stress of the extra litigation, and a jury may still

find that one of those causes was a "substantial" factors and was an "actual or proximate or legal cause of injury or death", under the rule in Milliken v. Bradley, 418 U.S. 717, 745, 94 Supreme Court 3112, 41 L. Ed. 2d 1069 (1974)(there could have been several reasons for the loss claimed here, and several people may have each contributed substantially to cause the harm and, therefore, all of them could be a legal or proximate or substantial cause of the loss if this jury says so), and Scirex Corp. v. Federal Ins. Co., 313 F.3d 841, 849-50 (United States Court of Appeals for the 3d Circuit 2002)(the direct cause of a loss "does not have to be the sole cause or immediate cause" of plaintiff's loss for him to prevail, "but need only be a proximate or substantial cause" of the loss to allow a damages award).

59. Because father had a history of success with alternative medicine and actually reversed the effects of stroke through such regular treatments, and because his condition deteriorated rapidly when he lost the extra income from the apartments for those treatments, these acts by SPARKS to deny that money and that necessary medicine and replace it with a daily diet of litigation stress were an actual and proximate or legal causes of a death than would otherwise have occurred later.

60. The time within which to sue for wrongful death in Arizona is three years, according to James v. Phoenix Gen. Hosp., 154 Ariz. 594, 744 P.2d 695, 698 (1987).

61. Because of the bankruptcy freeze and the prior appeals mentioned above, only 10 months of the time within which to file this action actually ran, from January 2010 when the bankruptcy appeals ended to October 2010 when son filed his new action in Arizona state court.

62. The denial of that fee waiver in the state court and the appeal from the denial also extended or suspended the deadline to sue until the denial by the Arizona Supreme Court. Therefore, this action is timely because it is filed after only 10 months of a three year deadline.

63. A proof of damages is not a requirement for an Arizona wrongful death claim, and a jury may award whatever it wishes to compensate for any loss that is fair and just whether or not related to the wrongful conduct and whether or not the loss was foreseeable to the defendant, according to the Arizona Supreme Court in Walsh v. Advanced Cardiac Specialists Chtd., 229 Ariz. 193, 197, 273 P.3d 645, 649 (2012).

64. Therefore, son asks the jury for damages for three types of injury.

65. The first type of injury is the loss to the family real estate business by the loss of father's companionship to his son and management of the family trust. Father is the master carpenter, an immigrant with nothing when he arrived who created a small empire worth over a million dollars because of a special expertise in real estate and was the Leader of the Band for his son, who was able to buy and build for the family trusts under father's direction but not without it. Son's real estate efforts were stopped and paralyzed for a decade, trying to litigate to get back the apartments and the income father needed for treatments to stay alive, and son has been adrift for years since father was taken because the guidance is gone, and son has never been able to generate the yearly income for the family trust that father could manage with rental properties because the rental properties are gone because SPARKS lost them all. Therefore, son seeks $100,000 a year for each year since the paralysis of the litigation in 2001, until father's death in 2008 and another $100,000 a year until this trial, for that missing expertise to the family trust, or $1.4 million.

66. The second type of injury is that the death prevents father from exercising his right to testify now about conversations with SPARKS, and from testifying in other family litigation to recover other property for the family trusts. As to this son asks the jury to treat son's allegations here as if father would have verified and supported them but for SPARKS' acts that ended that father's life and the ability to appear and testify in person, in this court now.

67. The jury is urged to consider that interfering with a client's right to sue his lawyer by the lawyer destroying evidence is a separate claim that allows a jury to assume the evidence would have been in favor of the client, under the rule in Hazen v. Municipality of Anchorage, 718 P. 2d 456, 463 (Alaska 1986)(intentional interference with prospective legal action by spoliation of evidence is an actionable tort).

68. Therefore, son asks the jury to decide if it is fair and right to consider SPARKS' actions which killed father early as a form of interfering with the ability of the witness to testify with his son.

69. The third type of injury is the loss of family medical experiments and son's chances for admission to a reputable graduate medical school for a career as a physician assistant because father had a history of reversing or "scaling-back" the symptoms of arterial occlusion with son's alternative medical treatments, which son because of son's age had to finish and publish to have any realistic chance of admission to the medical school and career.

70. Because SPARKS caused the loss of that chance at son's realistic admission to a graduate medical program, this jury may find SPARKS liable for the loss of that career of son, under the rule in Greenberg v. Hollywood Turf Club, 7 Cal.App.3d 968, 86 Cal.Rptr. 885, 890-91 [11] (1970) (plaintiff may sue for interference with trade or calling even though he had no job and no actual employment relationship and no license, because he was stopped before he could get access to any job); Gold v. Los Angeles Democratic League, 49 Cal.App.3d 372, 375 [13], 122 Cal. Rptr. 732, 739 (1975)(good claim for loss of career even though plaintiff had no track record in that office, and no existing contracts and merely took steps to run and was then stopped).

71. The value of that career is at least $2 million, and son asks for that award against SPARKS.

72. WHEREFORE, plaintiff is entitled to and prays for relief from this court from defendant for $3.4 million in damages for wrongful death alone.

73. Plaintiff now verifies the allegations of fact made herein.

74. A jury is requested.

DATED:   August 20, 2013

*Mel M. M...*

Mel  M.  Marin